BLACKER, GERSTLE & COMPANY, Appellants, v. WM. H. RYAN, Respondent.

Kansas City Court of Appeals, February 24, 1896.

1. **Fraudulent Conveyances:** SALES: REPLEVIN: BONA FIDE PURCHASER. A wholesale merchant may replevin goods delivered and unpaid for from a trustee in a deed of trust made by the purchaser to secure his creditors, when there was such fraud in the acquirement of the goods as to authorize a rescission of the sale, and the beneficiaries in the deed of trust are not *bona fide* purchasers thereof for value.

2. ———: INNOCENT PURCHASER FOR VALUE. Honest creditors of a fraudulent grantor in a deed of trust made for their benefit will not be regarded as *bona fide* purchasers for value, when they parted with no new consideration at the time of making such conveyance.

3. ——: ——: EXTENSION OF NOTE. Extension of the time of payment of a note by a valid agreement for any period however short, is a valid consideration and sufficient to support a mortgage as a purchase; but where there is no such extension, mere giving of a mortgage to secure the note is not such consideration.

4. ——: DEED OF TRUST: SCIENTER OF TRUSTEE AND BENEFICIARIES. Where a deed of trust is fraudulently given by the grantor to secure certain creditors, the participation of the trustee or the beneficiaries in the fraud of the grantor is sufficient to avoid the deed.

5. ——: ——: ——. The evidence in this case is *held* sufficient to send it to the jury on the question of fraud in the original contract of sale and in the making of the deed of trust and the participation of the trustee and some of the beneficiaries therein.

6. **Bills and Notes:** DAYS OF GRACE. Originally days of grace were matters of favor and not a right, but by custom they have become universally recognized, and under the law merchant enter into the constitution of every bill of exchange and negotiable note.

*Appeal from the Buchanan Circuit Court.*—HON. A. M. WOODSON, Judge.

REVERSED AND REMANDED.

*Dowe, Johnson & Rusk* for appellants.

(1) Under the evidence introduced by plaintiff, the case should have been submitted to the jury. The rule is well settled that if there is any evidence tending to prove the issues, the case must go to the jury. *Groll v. Tower*, 85 Mo. 249; *Moody v. Deutsch*, 85 Mo. 237; *Baum v. Trynear*, 85 Mo. 151. (2) It is the duty of the trial court in passing upon a demurrer to the evidence, to make every inference of fact in favor of the party offering the evidence which the evidence warrants, and which the jury with any degree of propriety might make. *Wilson v. Board of Education*, 63 Mo. 137; *Noenger v. Vogt*, 88 Mo. 589; *Rine v. Railroad*, 100 Mo. 228; *Herboth v. Gaal*, 47 Mo. App. 225. And a demurrer to the evidence should be sustained only

when the evidence, thus considered, fails to make proof of some essential fact. *Franke v. The City of St. Louis*, 110 Mo. 516; *Buesching v. Gaslight Co.*, 73 Mo. 219. (3) A seller has the right to rescind the sale and retake the goods from the buyer when the buyer bought them without intending to pay for them. *Fox et al. v. Webster*, 46 Mo. 181. And knowledge of the buyer that he will not be able to pay for goods bought is tantamount to an intention not to pay for them. *Elsass v. Harrington*, 28 Mo. App. 300; *Reid v. Lloyd*, 52 Mo. App. 278. This is seldom provable by direct evidence, but must in almost every case be found by the jury from surrounding circumstances. *Herboth v. Gaal*, 47 Mo. App. 255; *Blackwell v. Fry*, 49 Mo. App. 638. (4) One who makes a statement of his financial condition to a mercantile agency, which is communicated to a third person, who, on the faith thereof, gives credit to him, incurs the same liability to such third person as if the statement had been directly made. *Gries v. Blackman*, 30 Mo. App. 2; *Holmes v. Harrington*, 20 Mo. App. 661; *Mfg. Co. v. Coe*, 49 Ill. App. 426; *Lowden v. Fisk*, 27 S. W. Rep. 180. (5) Although knowledge or notice of the fraud of the purchaser must be traced to the mortgagee when the mortgage is founded on a new consideration, still this knowledge may be inferred by the jury from facts and circumstances sufficient to put a person upon inquiry. *Van Raalte v. Harrington*, 101 Mo. 602; *Rupe v. Alkire*, 77 Mo. 641. Hence, where there is proof of facts and circumstances sufficient to put a prudent man on inquiry, the question should go to the jury. (6) The participation of either the trustee or the beneficiaries of a deed of trust in the fraud of the grantor, is sufficient to avoid the deed. *Crow v. Beardsley*, 68 Mo. 435; *Pope v. Pope*, 40 Miss. 516; Devlin on Deeds, sec. 784. (7) The only new con-

sideration in the deed of trust in this case is the extension of time therein given on the notes that were due. The only note due on October 6, when the deed of trust was executed, was the note to John C. Ryan, Sr. The note to the Commercial Bank, dated July 6, due ninety days after date, would not be due until October 7.

*Willard Hall, Vinton Pike* and *Thomas F. Ryan,* for respondent, filed an argument on rehearing.

GILL, J.—This is a suit in replevin for the recovery of about $1,100 worth of boots and shoes which the plaintiffs, as wholesale dealers at Cincinnati, Ohio, sold to John C. Ryan, Jr., a retail dealer in St. Joseph, Missouri. Plaintiffs assert a right to rescind the sale and reclaim the goods because of an alleged fraudulent purchase by John C. Ryan, Jr.; while the defendant, W. H. Ryan, claims under a deed of trust made to him October 6, 1893, by said John C. Ryan, Jr., to secure a note of about $9,400 which said John C. Ryan, Jr., had given his father, J. C. Ryan, Sr., together with two notes of $1,000 each, which said Ryan had made to the Commercial Bank of St. Joseph, and one note of $1,500, executed by the same party to the Schuster–Hax National Bank of St. Joseph.

At the close of plaintiffs' evidence, the court sustained a demurrer thereto and directed a verdict for defendant, and from a judgment against them plaintiffs appealed.

I. The point is, whether or not the trial judge was justified in taking the case from the jury. Counsel for respondent have not seen proper to furnish us a brief. We have, however, in the light of an able and exhaustive brief and argument by plaintiffs' counsel, examined the evidence contained in the abstract and

have concluded that the trial court erred in peremptorily instructing the jury to find for defendant.

We shall not, in the brief space of an opinion, attempt to give in detail all the facts to be gathered from this bulky record. A statement somewhat elaborate is, however, necessary to a complete understanding of the main issues.

In the year 1890 and several years prior thereto, John C. Ryan, Sr., conducted a general merchandise business at Spearfish, South Dakota. A portion of the time he had in his employ his two sons, John C., Jr., and defendant William H. Ryan. They were then young, perhaps twenty-two and twenty years old, respectively. In the latter part of the year 1890, John C. Ryan, Jr., left home and found his way to St. Joseph, where he, for a time, engaged as clerk in a store. In the early part of 1891, said Ryan, Jr., conceived the idea of going into the retail boot and shoe business at St. Joseph, and about the same time his father, Ryan, Sr., concluded to go out of the boot and shoe business in Dakota. The father came into St. Joseph and assisted his son Ryan, Jr., in selecting a house in which to do business. Ryan, Sr., then returned to Dakota and shipped to St. Joseph his entire stock of boots and shoes. There is at least a pretense that this was a sale by the senior to the junior Ryan, and that the amount thereof was $4,300, for which he gave his note, being ninety cents on the dollar of the cost of such goods laid down in Dakota. In February, 1891, Young Ryan opened a boot and shoe store at St. Joseph, his only capital, outside of the Dakota stock, being about $500 in cash. The first thing young Ryan did after going in business was to make a statement of his financial condition to the Dun mercantile agency. This statement was as follows: "I am twenty-three years of age and married and will

open up business in a few days. Previous location, Spearfish, S. D.; assets, merchandise on hand, $7,300; outstanding accounts, $500; fixtures, $750; cash on hand, $300; total assets, $8,850; no liabilities, net worth above debts and exemptions $8,850; merchandise insured for $4,000." In that statement he said nothing at all about owing his father a note of $4,300, or owing any sum for borrowed money, although both he and his father testified that at that time he had executed to his father a note for the purchase price of the goods, bearing interest at the rate of eight per cent per annum. Nowhere on the books opened by young Ryan at that time, is there anything to indicate that he owed his father anything. He started out as follows: (from page 1 of his Daybook) "J. C. Ryan, Jr., commenced business February 11, 1891. Merchandise on hand, $7,300; fixtures in store, $730; cash in bank, $450; merchandise, $371.09." It was not till after his failure that his books showed an indebtedness to his father. Ryan, Jr., continued to run the store during the years 1891-1892, with nothing worth relating, except that he changed his location to another part of the city (and that, too, under the advice and assistance of his father, who, for that purpose, came all the way from Dakota), and in the meantime (as they both testify) got some money from Ryan, Sr. During these years, Ryan, Sr. spent much, if not the major part, of his time, with his son at St. Joseph.

In the early summer of 1893 (when, it will be remembered, the final depression set in) the Ryan stock seems to have been large, and yet Ryan, Jr., gave orders to eastern firms for the fall trade to the amount of $17,000, or more—goods to be delivered about the first of September. The parties to whom these orders were given were chiefly parties with whom he had not

previously dealt; among these, being the plaintiffs in this suit, and for the amount of goods hereinbefore stated. These goods were, it seems, to be delivered September 15, 1893.

On the eighth day of August, 1893, shortly after these large orders were made, Ryan, Sr., again appears at St. Joseph, and Ryan, Jr., at once executed a thirty-day note to his father for $9,414.56, and to secure the same the young Ryan made a secret chattel mortgage covering the entire stock of goods. In accordance with an understanding between the parties, this instrument was kept off the record, but was doubtless intended to be recorded when the emergency might arise. Ryan, Sr., then went back to Dakota, but on the summons of the young Ryan, returned again during the first days of October; and it was then, on October 6, 1893, the prior secret chattel mortgage was destroyed and the deed of trust in question executed. The defendant, W. H. Ryan, was by this instrument made trustee with power of sale, and he immediately took possession of the entire assets belonging to the boot and shoe business. This trustee and defendant was a younger brother of John C. Ryan, Jr.; he was, and had been, for two years engaged as a clerk in the store and, as the evidence tends to show, was, and had been, in a condition to be fully informed of all the transactions hereinbefore stated. He, however, denied on the witness stand any such knowledge.

The testimony further shows that Ryan, Jr., made repeated reports to the commercial agencies as to his standing as a merchant; that such reports (subsequent to the first, which we have quoted) were of the same general character, except, indeed, that the business was even on a more substantial basis than when he began; and in none of these reports did he ever disclose the fact that his father held a claim of any amount against

him. The evidence shows, too, that these plaintiffs obtained these reports before selling Ryan, Jr., any goods, and acted on the faith thereof. Another significant circumstance is that during the period of a few weeks, just before this deed of trust was executed, more than two hundred cases of new goods were received into the store, and among them the goods in controversy, which plaintiffs shipped September 23 and 28, 1893, from Cincinnati, Ohio. And further, another circumstance, detailed in the evidence, tends to cast suspicion on the good faith of Ryan, Jr. In August plaintiffs wrote to the young man, reminding him of the general business depression prevailing over the country, and offered to modify the orders he had sent in and to some extent relieve him therefrom. But on August 9 (the day after making the secret mortgage to his father) Ryan, Jr., responded by declining the offer and requesting that all the goods be forwarded according to the previous arrangement; and a very few days thereafter (August 18) wrote further: "Please ship my order as soon as you can, and oblige. J. C. Ryan, Jr."

II. Now, there are several theories upon which the plaintiffs might recover these goods. The main fact, *first*, to be established is that Ryan, Jr., fraudulently acquired the goods, so as to authorize plaintiffs to rescind the contract of sale as to said purchaser, and reclaim said goods; and, *second*, it must appear that the beneficiaries in the deed of trust are not such *bona fide* purchasers thereof for value as will be protected even though Ryan, Jr., was guilty of the fraud charged. There is abundant evidence in this record tending to sustain the first of these propositions. The testimony in plaintiffs' behalf tends to prove that the junior Ryan fraudulently ordered and secured plaintiffs' goods, with no expectation or intention of paying therefor; that in order to get them he fraudulently, and know-

ingly, misrepresented his financial standing; and that plaintiffs were induced to part with their goods and sell them to said Ryan, Jr., relying on the truth of such false and fraudulent statements. This, then, gave plaintiffs the right, on discovering the fraud, promptly to repudiate the sale; and, as to said Ryan, Jr., at least, they were entitled to repossess themselves of the goods. And we think, too, there was sufficient evidence to go to the jury on the second proposition above stated.

In so far as the two banks were concerned, they are not to be regarded in the light of innocent purchasers for value. They were unquestionably honest creditors of Ryan, Jr., but as they parted with nothing when the deed of trust was executed, gave no new consideration, they are not to be regarded as *bona fide* purchasers *for value*. By the terms of the deed of trust, time of payment was only extended as to the ''notes then due.'' The notes of said banks, so secured by the deed of trust, were not due when said deed was executed.

As to Ryan, Sr., who claims to be a creditor by virtue of the note of $9,414.56 executed by his son August 8, 1893, there is abundant evidence tending to impeach his standing as even a genuine *creditor* of his son. The circumstances from beginning to end make *plausible*, at least, the claim that this St. Joseph enterprise was a mere scheme to affect a ''wind up'' of the Dakota store; that Ryan, Sr., adopted this plan of selling out the old, self-worn remnant of a stock of goods which he had at Spearfish. We might here refer to the circumstances attending that sale, the apparent high price at which the son at St. Joseph took the goods, the continued attention and solicitude the old gentleman gave to the St. Joseph store and his readiness to advance the necessary funds, from time

to time, to keep the concern going until he saw his way clear to get his money out, etc. etc.; but we deem it unnecessary to go into the matter any further in detail. However this may be, admitting Ryan, Sr., to have been a real creditor, and yet the circumstances would fully justify a jury in finding that he all the time knew of the son's schemes to defraud his creditors and actively participate therein. It is not to be expected that such frauds will be openly performed or frankly admitted by the actors; hence, they can ordinarily be proved only by other facts and circumstances pointing to the guilty act. While the relationship existing between the parties is not conclusive, it is yet a circumstance to be considered with others, in determining the question of the father's knowledge or notice of the fraudulent purposes of the son. Besides this matter of relationship, the evidence is that the elder Ryan spent much of his time at St. Joseph and in the store of his son; received his mail there, and made it his headquarters. It is very reasonable to infer from these and other facts and circumstances detailed in the evidence, that Ryan, Sr., was all the time posted in relation to the fraudulent purposes of the junior Ryan, about matters, too, in which he had so large a moneyed interest.

The same character of evidence tends to implicate W. H. Ryan, the brother of J. C. Ryan, Jr., and the trustee in the deed of trust made to secure the senior Ryan and the two St. Joseph banks. He was not only the near relative of J. C. Ryan, Jr., but the evidence shows they were on the most intimate terms. W. H. Ryan was for two years a clerk in the store and the intimate and confidential companion of J. C. Ryan, Jr. The jury might well infer, then, from this and other circumstances that W. H. Ryan was cognizant of, and participated in, the fraudulent purposes

of his brother. In *Crow v. Beardsley*, 68 Mo. 435, it was said that, "the participation of either the trustee or the beneficiaries in the fraud of the grantor is sufficient to avoid the deed." So, admitting the purpose of J. C. Ryan, Jr., was to defraud his creditors, and that the elder Ryan and W. H. Ryan both had notice thereof and participated therein, then not only will such fraudulent act be void as between such defrauded creditors and Ryan, Sr., but as well between said defrauded creditors and the other beneficiaries, whom said trustee represented.

On a review of the entire evidence, as it has been presented here, we are of the opinion that plaintiff was entitled to go to the jury on the issues involved, and that the trial court, therefore, erred in sustaining a demurrer to plaintiffs' evidence.

The judgment, therefore, will be reversed and cause remanded. All concur.

### ON REHEARING.

GILL, J.—After the announcement of the foregoing opinion, respondent's counsel appeared, and on their request and for good reasons shown, we have reconsidered the case, on additional briefs by both parties.

Counsel for respondent have argued that one of the notes held by the Commercial Bank of St. Joseph, and attempted to be secured by the deed of trust of Ryan, Jr., to W. H. Ryan, trustee, was, within the meaning of the parties, due on the day the deed of trust was executed; and that there was, therefore, as to it, an extension of time, which would constitute said bank a *bona fide* purchaser for value.

"The giving of further time for the payment of an existing debt by a valid agreement, for any period,

however short, is a valuable consideration, and is suffi-
cient to support a mortgage, as a purchase for a valu-
able consideration." *Cass County v. Oldham*, 75 Mo.
50. But did the deed of trust of John C. Ryan, Jr., to
W. H. Ryan evidence a contract extending the time of
payment of the note in question? It was therein
recited that the parties "agree to and do extend the
time for payment of the notes above described, *that are
now due*, until the tenth day of October, 1893."

In the former opinion, we said that the note to the
elder Ryan for $9,414.56 came under that designation
of *then due*, but that the notes to the two banks were
not then due, and hence there was, as to them, no
extension of time. The Commercial Bank held two
notes (included in the deed of trust), one for $1,000,
executed July 6, and the other for the same amount,
dated July 18, both containing a promise to pay *ninety
days after date*. Including, now, days of grace, it is
clear that the note dated July 6 did not become due
till October 7, 1893. The deed of trust was executed
October 6, 1893. When, therefore, the deed of trust
was executed, this note was not due and, hence, there
was no agreement to extend its time of payment.

Formerly, "days of grace" were days extended to
the drawee of a bill or payor of a note, in the way of a
favor from the holder; they were gratuitous merely,
dependent on the pleasure of the holder of the bill or
note and could not be claimed by the drawee or payor
as a matter of right. "By custom, however, they
became universally recognized; and though still termed
'days of grace,' they are now considered wherever the
law merchant prevails as entering into the constitution
of every bill of exchange and negotiable note, both in
England and the United States, and form so com-
pletely a part of it that the instrument is not *due in
fact or in law* until the last day of grace." 1 Daniel

Neg. Inst. [4 Ed.], sec. 614; Story on Prom. Notes [7 Ed.], sec. 215; 1 Parsons N. & B. [2 Ed.], p. 395.

The note, then, of the Commercial Bank, made July 6, is to be treated as if it had named the due day October 7, 1893. Nor is there anything even extrinsic to the deed of trust that shows that the parties intended to consider the note as due at a prior date, or that there was any understanding that the time of its payment was extended. In fact, Mr. Hull, the bank's cashier, though admitting that Mr. Ogden, the president, had most to do with the matter, testified that he "made no arrangement with Mr. Ryan to carry him beyond the time of the maturity of these notes and never knew of any such arrangement."

It is needless for us to comment to any great extent on the last point made in respondent's brief. There is abundant evidence disclosed in the record, tending to prove, not only that W. H. Ryan, the trustee, had notice of his brother's design to defraud the plaintiffs, but that said trustee actively *participated* in the scheme, and that the execution of this deed of trust was for the purpose of carrying out the same. This being so, the case comes squarely under the principle announced in *Crow v. Beardsley*, 68 Mo. 435. We know of no later case overruling this and hence we are bound to regard it as controlling authority. Paraphrasing a statement contained in that decision, we may say: "If John C. Ryan, Jr., by the conveyance intended to defraud his creditors, and either the trustee or the beneficiaries were privy to such intended fraud, it would invalidate the conveyance."

The fraud of John C. Ryan, Jr. (as it might be found from the evidence) consisted not only in the fraudulent purchase of plaintiff's goods, but in the after disposition thereof. And from the evidence

the jury might well conclude that W. H. Ryan was engaged in an effort to assist therein.

We repeat, then, that the evidence adduced at the trial made a case for the jury and it was error to take it from them. The judgment must be reversed and cause remanded. All concur.